Sealed

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
### CIVIL DIVISION

UNITED STATES OF AMERICA
*ex rel.*
[UNDER SEAL]

Relator

vs.

[UNDER SEAL]

Defendants.

# 16 - 60853

FILED by _____ D.C.

APR 18 2016

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S. D. of FLA. – MIAMI

Civil Action No. _____

W. Williams

**TO BE FILED IN CAMERA AND
UNDER SEAL**

**DO NOT PUT IN PRESS BOX
DO NOT ENTER ON PACER**

## DOCUMENT TO BE KEPT UNDER SEAL

### DO NOT ENTER ON PACER

MAGISTRATE JUDGE
SIMONTON

Bryan A. Vroon, Esq.
Georgia Bar No. 729086
Law Offices of Bryan A. Vroon, LLC
1766 West Paces Ferry Road
Atlanta Georgia 30327
(404) 441-9806
bryanvroon@gmail.com

Jonathan Kroner
Florida Bar No. 328677
Jonathan Kroner Law Office
420 Lincoln Rd., Suite 248
Miami Beach, FL 33139
305.310.6046
JK@FloridaFalseClaim.com

## IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF FLORIDA

## CIVIL DIVISION

UNITED STATES OF AMERICA
*ex rel.*
DAVID DI PIETRO

Relator

**TO BE FILED IN
CAMERA AND
UNDER SEAL**

vs.

DO NOT PUT IN PRESS BOX

DO NOT ENTER ON PACER

21ST CENTURY ONCOLOGY, INC.;
AND JOHN DOES 1-100

Defendants.

## Relator's Complaint Under the Federal False Claims Act

2

I.   Introduction ......................................................................................................... 4

II.   Jurisdiction, Venue, and Parties ........................................................................ 5

III.   21st Century's Scheme to Induce Referrals ....................................................... 6

   A.   Introduction to the Extraordinary Contract ............................................ 6

   B.   Nask Arranged for "Hush Money" Payments to HealX Oncology ................. 8

   C.   Nask Obscured the Economics from the Broward Health Board ................. 11

   D.   Broward Health Gave 21st Century an Excessively Lucrative Contract ........ 13

   E.   21st Century Has Enjoyed a Risk-Free Windfall ........................................ 16

   F.   Nask Pushed the Deal without the Usual Fair Market Valuations .................. 16

   G.   Nask Sought to Hide the Extraordinarily Lucrative Deal ........................... 19

   H.   The Contract Has Caused Major Losses to Broward Health ........................ 20

   I.   21st Century Orchestrated Kickbacks ....................................................... 24

   J.   21st Century's Continuing Scheme to Protect the Illegal Contract .................. 32

   K.   Current Political Shenanigans with the Governor's "Investigation" of Broward Health ........................................................................................ 34

IV.   The Law ................................................................................................................ 35

   A.   The False Claims Act ................................................................................ 35

   B.   The Federal Anti-Kickback Statute .......................................................... 37

   C.   Federal Healthcare Program Overview .................................................... 40

      1.   The Medicare Program ........................................................................ 40
      2.   Medicaid Program ............................................................................... 44
      3.   TRICARE ............................................................................................. 45

V.   Counts under the Federal False Claims Act ...................................................... 45

   A.   Causing False Claims, 31 U.S.C. § 3729(a)(1)(A) ...................................... 45

   B.   Making False Statements, U.S.C. § 3729(a)(1)(B) ..................................... 46

   C.   Conspiring to Submit False Claims, 31 U.S.C. § 3729(a)(1)(C) .................... 48

   D.   Causing False Certifications, 31 U.S.C. § 3729(a)(1)(B) ............................ 49

   E.   Knowingly Retaining Overpayments, 31 U.S.C. § 3729(a)(1)(G) ................. 50

   F.   False Record to Avoid Refund, 31 U.S.C. § 3729 (a)(1)(G) ........................ 51

VI.   Prayers for Relief ................................................................................................ 51

# I.    <u>Introduction</u>

1.    This is an action to recover statutory damages and civil penalties under the False Claims Act, as amended, 31 U.S.C. §§ 3729-33. Under the False Claims Act, a private person may sue in federal district court for himself and the United States. That private person is a *relator*, and the action that the relator brings is called a *qui tam* action.

2.    On behalf of the United States, Relator David Di Pietro brings this *qui tam* action against 21st Century Oncology, Inc. ("21st Century") to recover moneys wrongfully billed to Federal Healthcare Programs in violation of the Anti-Kickback Statute and the False Claims Act.

3.    The Anti-Kickback Statute prohibits the offer of any remuneration to induce patient referrals. It defines remuneration to include "any kickback, bribe, or rebate, directly or indirectly, overtly or covertly, in cash or in kind." *See* 42 U.S.C. §1320a-7b(b)(1).

4.    The Department of Health and Human Services Office of the Inspector General (HHS-OIG) has repeatedly confirmed "remuneration" means "anything of value." *See, e.g.*, Safe Harbor Provisions Under the Anti-Kickback Statute, 64 Fed. Reg. 63518 (1999).

5.    The Anti-Kickback Statute arose out of congressional concern that kickbacks given to those who can influence healthcare decisions corrupt medical decision-making. Additionally, unfair competition results when honest medical providers must compete with those who arrange kickbacks to generate business.

6.    As detailed below, 21st Century has orchestrated a scheme of illegal kickbacks to control referrals of cancer patients for radiation oncology services at North Broward Hospital District d/b/a Broward Health, one of the largest public healthcare systems in the United States.

7.    Under the federal False Claims Act, on behalf of the United States, Di Pietro seeks to recover all available damages, civil penalties, and other relief arising from 21st Century's

conduct described in this Complaint.

## II.   Jurisdiction, Venue, and Parties

8.      Relator David Di Pietro is a resident of Broward County, Florida. On September 9, 2011, Florida Governor Rick Scott appointed Di Pietro to the Broward Health Board of Commissioners.

9.      Di Pietro served as a Commissioner of Broward Health from September 9, 2011 until March 18, 2016. He served as Chairman of the Board from October 23, 2013 until March 18, 2016.

10.     Defendant 21st Century Oncology, Inc. operates approximately 145 cancer treatment centers in 17 U.S. states. The headquarters of 21st Century are in Ft. Myers, Florida.

11.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought under 31 U.S.C. §§ 3729 and 3730.

12.     Personal jurisdiction and venue are proper in this District under 28 U.S.C. §§ 1391(b) and 1395(a) and 31 U.S.C. § 3732(a), as 21st Century has transacted business and engaged in the illegal conduct at issue within this District.

13.     This action arises under 31 U.S.C. § 3729, *et seq*, popularly known as the False Claims Act which provides that the United States District Courts shall have exclusive jurisdiction over actions brought under that Act.

14.     The False Claims Act provides, "Any action under section 3730 may be brought in any judicial district in which the defendant or, in the case of multiple defendants, any one defendant can be found, resides, transacts business, or in which any act proscribed by section 3729 occurred." 31 U.S.C. §3732(a).

15.     Di Pietro has complied with 31 U.S.C. §3730(b)(2) by serving a copy of the Complaint and his written disclosure of substantially all material evidence and information in his possession upon the United States Attorney for the Southern District of Florida and the United States Attorney General.

16.     In addition, Di Pietro, through his counsel, communicated in writing with agents of the Department of Justice and provided them with relevant information in this Complaint prior to any public disclosure as defined by the False Claims Act and prior to filing this suit.

17.     The allegations and facts supporting this action have not been publicly disclosed through any of the sources enumerated in the False Claims Act.

18.     The facts supporting this action are based on Di Pietro's personal knowledge, experience, communications, and investigation while serving as a Commissioner on the Broward Health Board.

### III.     21st Century's Scheme to Induce Referrals

#### A. *Introduction to the Extraordinary Contract*

19.     With approximately 8,000 employees, Broward Health operates more than 30 healthcare facilities, including Broward Health Medical Center, Broward Health North, Broward Health Imperial Point, Broward Health Coral Springs, Chris Evert Children's Hospital, and Broward Health Weston.

20.     Broward County property owners pay taxes each year that are designated for Broward Health. Such annual property taxes given to Broward Health average approximately $170 million.

21.     Broward Health treats over 900,000 patients each year. 21st Century targeted Broward Health for an exclusive contract because Broward Health is a major regional treatment center for

cancer patients and a major source of patient referrals.

22.    A contract for 21st Century to be the exclusive provider of radiation oncology services to cancer patients at Broward Health has meant the referral of thousands of patients within Broward Health's massive health system, including thousands of patients insured by Medicare and other Federal Healthcare Programs. The referrals of thousands of cancer patients have represented a lucrative revenue stream for 21st Century.

23.    In the years prior to 2011, 21st Century had sought and failed to procure a contract inside Broward Health.

24.    Yet in September of 2011, 21st Century gained control of Broward Health's referral stream of cancer patients, the entire radiation oncology infrastructure of general space, vault space, and radiation equipment at Broward Health's hospitals, and "Global Revenues" from treating such patients.

25.    Broward Health did not issue any public request for bids on this business. No other company received notice or opportunity to bid on a contract to provide radiation oncology services at Broward Health.

26.    Prior to entering into the contract terms with 21st Century in September 2011, Broward Health did not obtain any independent fair market valuation of the economics of the deal.

27.    The existence of the 21st Century contract was recently revealed in the media to the public. What hasn't been revealed is why and how 21st Century received this extraordinary contract from Broward Health. The answer is kickbacks described in detail below. In orchestrating the kickbacks, 21st Century's objectives included the referral of thousands of cancer patients insured by the Medicare Program.

## B. *Nask Arranged for "Hush Money" Payments to HealX Oncology*

28.     To give the radiation oncology deal to 21st Century, Broward Health's Chief Executive Officer, Frank Nask, orchestrated the termination of the existing contract with HealX Oncology ("HealX") and arranged for "hush money" to be paid to HealX in the amount of $830,000.  In September of 2011, Nask arranged for these payments because he did not want any opposition from HealX that could have caused scrutiny of the deal with 21st Century.

29.     In September of 2011, Nask requested three checks issued to HealX without Board knowledge and without Board approval. The check amounts were $250,000, $250,000, and $330,000.

30.     In the check requests, Nask contrived reasons for each check to conceal the truth of hush money being paid.

31.     Nask requested two checks for $250,000 each because under Broward Health's policies, he could not authorize any payment over $250,000 without Board approval.

32.     One check for $250,000 was supposedly a "termination fee." On September 15, 2011, Broward Health issued check number 1444886 in the amount of $250,000 to HealX. Nask approved the check request for the purpose of "termination of agreement in accordance with Section 3.1."

33.     The cited Section 3.1 of the Agreement with HealX did not support or require any termination payment. Section 3.1 states in full,

> **Services**. Contractor shall provide Services to Operator through Operator-approved Specialists as outlined and contemplated under this Agreement. Contractor shall also provide Services to Operator through on-call coverage, seven days a week, including holidays, 24 hours each day at the Hospitals."

34.     The other check for $250,000 was supposedly for an 18-month "non-compete agreement" related to "the proton beam project in the geographical area of the Broward Health governing

district."[1] *See* Termination/Settlement Agreement, Par. 2, p. 2.

35.     The truth is that there were no other proton beam radiation machines in Broward Health's geographical governing district of northern Broward County. Broward Health never purchased the proton beam radiation machine that it was supposedly attempting to protect. The "non-compete" payment was a sham.

36.     On September 15, 2011, Broward Health issued check number 1444887 in the amount of $250,000 to HealX. Nask approved the check request for the purpose of "termination of agreement in accordance with Section 6.4." The check request did not mention a supposed "non-compete" agreement.

37.     The referenced Section 6.4 of the Agreement with HealX only required payment of a termination fee if "either party terminates this Agreement, other than outlined in this Section 6…" "The terminating party shall pay to the non-terminating party a lump sum Termination Fee of $250,000.00."

38.     Yet Nask told the Board of Commissioners that HealX quit the contract. If this was true, there was no contractual requirement for Broward Health to pay any termination fee. Instead, HealX owed a $250,000 termination fee to Broward Health.

39.     The Termination/Settlement Agreement with HealX states, "Broward Health and HealX do hereby mutually agree and acknowledge that it is the intent of both parties…to terminate the Agreement…." *See* Termination/Settlement Agreement and Release, p. 1. If the contract was terminated by mutual agreement, there was no contractual requirement for Broward Health to

---

[1]     In proton therapy, energy is carried by protons—the positively charged particles in an atom. Protons are raised to a high energy level by a powerful machine called a particle accelerator.Unlike the photons in X-rays, proton beams stop after releasing their energy within their target. A proton beam can be much more finely controlled, so higher doses of radiation can be more safely delivered to tumors with less risk to healthy tissue.

pay any termination fee.

40.     Prior to paying the supposed "non-compete" cash to HealX, Broward Health did not obtain any independent fair market valuation supporting this amount.

41.     The third check in the amount of $330,000 was purportedly for "director fees" for three years, 2008-2011. Broward Health paid this amount without any supporting documentation such as hourly time sheets showing director services performed.

42.     On September 8, 2011, Ms. Kathleen Collins in Broward Health's Accounting Department sent an email to Colleen Hughes in Accounting which stated: "Go ahead and do this per Debbie Breen…I am aware nothing (time sheets) are attached."  Debbie Breen was the Broward Health Controller.

43.     Nask signed the check request for $330,000.00 on September 7, 2011. The request states, "Fee is for Medical Director from Dec. 2008 until August 2011."

44.     One day later on September 8, 2011, Broward Health issued check number 1443945 in the amount of $330,000.00 made payable to HealX.

45.     The Termination/Settlement Agreement and Release between Broward Health, HealX Oncology, and Dr. Anurag Agarwal provides that "HealX and Dr. Agarwal "release[d]" and "forever discharge[d]" Broward Health in consideration of "the total sum" of $250,000.00. Yet in the days surrounding execution of the Termination/Settlement Agreement on September 15, 2011, Broward Health made three payments to HealX and Dr. Agarwal in the total amount of $830,000.

46.     Nask arranged these three payments to buy silence.

## C. *Nask Obscured the Economics from the Broward Health Board*

47.     Four months later in January of 2012, Nask lobbied the Board for formal approval of the 21st Century contract already commenced in September of 2011. Nask's signing authority on behalf of Broward Health was limited to $250,000 and the deal with 21st Century was worth far more than that limit.

48.     In January 2012, Di Pietro met with Nask about the 21st Century contract. At that meeting, Nask told Di Pietro that it was "very important" that he support the contract with 21st Century. Nask told Di Pietro that HealX was losing money for Broward Health and the deal with 21st Century would eliminate the losses.

49.     On January 17, 2012, Nask sent a memorandum to the Broward Health Board requesting "approval" to "enter into Services Agreement and Licensing Agreement which will result in Broward Health outsourcing the day to day operation of Radiation Oncology to 21st Century Oncology."

50.     In his memorandum to the Board, Nask stated, "This arrangement will allow Broward Health to reduce the present projected loss of providing the Radiation Oncology Service from the 2012 projected loss of $3,254,940 to a loss of $1,100,000—an important improvement of approximately $2,100,000."

51.     On January 17, 2012, Nask represented to the Board: "With the new agreement with 21st Century, the program is projected to lose $1,100,000 per year. As the financial performance of 21st Century improves, the subsidy received from Broward is intended to decrease to $0."

52.     In his signed Summary of Request to the Board on January 17, 2012, Nask represented, "Under the new agreement with 21st Century Oncology, **they will assume the day to day operation and absorb the costs associated** including paying $880,000 to Broward Health for

the use of the space and equipment." (emphasis added).

53.    The source of Nask's financial data is unclear. Broward Health never obtained any independent fair market valuation of the economics of the deal with 21st Century.

54.    Nask's numbers were not accurate according to Broward Health's cost reports submitted to the Centers for Medicare and Medicaid Services ("CMS") discussed in detail below. Under the deal with 21st Century, Broward Health would lose over 30 million dollars in the first five years of the contract and Nask knew or should have known of such expected losses.

55.    The Board did not know and did not receive accurate facts about the true economics of this deal.

56.    In his memo and communications to the Board, Nask did not reveal to the Board that the new contract allowed 21st Century to bill, collect, and keep all Global Revenues associated with outpatient radiation oncology services at Broward Health's facilities. Nor did he reveal the value of such billings or the value of Broward Health's guaranteed payments for inpatient and indigent patients.

57.    In his memo and communications to the Board, Nask did not reveal that he arranged for hush moneys in the amount of $830,000 paid to HealX four months earlier.

58.    In his memo and communications to the Board, Nask did not reveal that prior to entering the deal, Boward Health did not obtain any independent fair market valuation regarding the economics of the deal with 21st Century.

59.    At the Board meeting in January of 2012, Nask led the Board to believe that HealX had quit. Nask's representation was not accurate.

60.    Nask told the Board that HealX had "left" and Broward Health "needed to get someone in to make the transition." According to the meeting minutes, Nask "said that they were able to

resolve this issue in a matter of 120 days and there was no requirement to do the RFP [request for proposals]."

61.    In his memo and communications to the Board, Nask did not reveal the kickbacks orchestrated by 21st Century that induced the deal.

62.    Di Pietro would not learn the true facts until years later.

### D. *Broward Health Gave 21st Century an Excessively Lucrative Contract*

63.    As mentioned above, Nask did not reveal to the Board that the new contract allowed 21st Century to bill, collect, and keep all Global Revenues associated with outpatient radiation oncology services at Broward Health's facilities. This contract provision was a major change in the billing arrangement for radiation oncology services at Broward Health.

64.    Prior to the time Nask entered this deal with 21st Century, Broward Health had a contract in effect with HealX to provide physician radiation oncology services at Broward Health. That contract which began in January of 2008 allowed Broward Health to bill for the non-professional component of radiation oncology services and allowed HealX to bill only for professional physician services. [2]

65.    The HealX contract term was three years ending December 31, 2010 and "shall automatically renew for two (2) three (3) year periods." ¶ 6.1. The termination without cause

---

[2]    The Radiation Oncology Services Agreement between Broward Health and HealX Oncology stated in pertinent part: "The parties acknowledge that the fees to be charged hereunder consist of two components, a professional component for Services, consisting of time and attention provided by a [physician] Specialist, as well as a non-professional component consisting of the use, availability, and maintenance of facilities, resources, equipment, and including certain other overhead costs of Operator incurred in operating the Health Care Facilities." ¶ 5.2. HealX "shall bill and collect (for its own account) for the professional component of Services rendered by the Specialists" with limited exceptions. ¶ 5.3. Broward Health "shall bill and collect for the non-professional component of Services rendered by the Specialists." ¶ 5.3.2. "Amounts collected for the non-professional component of fees for services shall be collected by [Broward Health] for [Broward Health's] own account." *Id.*

provision did not take effect until January 1, 2014 with "180 days prior written notice to the other party." ¶ 6.2.6.

66.     Prior to entering the contract with 21st Century in September of 2011, Broward Health employed numerous administrative and medical staff providing radiation oncology services to inpatients and outpatients. Broward Health was collecting the non-professional component of fees for such radiation oncology services.

67.     Yet in September of 2011, Nask signed a deal with 21st Century that authorized 21st Century to bill, collect, and keep all fees associated with radiation oncology services for outpatients[3] at Broward Health facilities.

68.     With limited exceptions, the contract authorized 21st Century to bill third parties, including Federal Healthcare Programs, directly for all Global Revenue associated with outpatient radiation oncology services at Broward Health facilities.

69.     The Amended and Restated Radiation Oncology Services Agreement between Broward Health and 21st Century states in pertinent part, "The parties acknowledge that the fees to be charged by [21st Century Oncology] hereunder consist of (i) Professional Revenue, (ii) Facility Revenue and (iii) Technical Revenue (collectively, 'Global Revenue')." ¶ 5.2.

70.     The Agreement further states that 21st Century Oncology "shall bill and collect (for its own account) for the Global Revenue." ¶ 5.3.1.

71.     The Agreement authorized Broward Health to bill and collect for inpatient admissions; however, if "any Inpatients require the services of [21st Century], [21st Century] agrees to provide all such services, and [Broward Health] shall make payment for such Services to [21st Century] at the rate equal to sixty-five percent (65%) of Medicare allowable rates..." *See*

---

[3]     Most radiation oncology services are provided on an outpatient basis.

Amended and Restated Radiation Oncology Services Agreement, Par. 5.4.2. Such rates were based on global payments from Medicare and not simply the professional fees for physician services.

72.     In addition, Broward Health agreed to pay 21st Century for treating "indigent patients" at three different levels: "(1) high level services (prostate, lung, head and neck): $21,000.00, (2) intermediate level services (breast, gastrointestinal (esophagus, pancreas, rectum, and canal), brain): $14,000, and (3) low level services (lymphoma, skin, palliative cases): $8,000.00." *See* Exhibit F to Radiation Oncology Services Agreement.

73.     These amounts are listed as supposedly "65 percent of Medicare allowable rates"; however, Medicare does not pay for radiation oncology services based on these categories.

74.     Moreover, these rates are not simply based on the professional physician fees. Broward Health agreed to pay 21st Century 65 percent of the "Medicare allowable" global payments for particular cancer diagnoses.

75.     Broward Health also agreed to pay fees to 21st Century Oncology for "Medical Director" services at $192.00 per hour up to $120,000 per year. *See* ¶ 5.4.3.

76.     Under this deal, 21st Century would pay Broward Health monthly lease amounts for the use of hospital space and radiation equipment. The annual lease payments by 21st Century to Broward Health are approximately $880,000.

77.     The original length of the contract is 10 years with an option for 21st Century to extend the contract 3 times for 5-year periods.

78.     Either party could terminate the contract after 3 years with 270-day notice. Therefore, the contract term was at least nearly 4 years and potentially 25 years. A contract with a potential duration of 25 years is exceedingly rare in healthcare due to changing dynamics in the industry.

79.     Over the potential 25-year term of the contract, potential billings by 21st Century will exceed $800 million.

### E. *21st Century Has Enjoyed a Risk-Free Windfall*

80.     Under the Radiation Oncology Services Agreement with Broward Health, 21st Century has no risk of financial loss.

81.     The deal placed 21st Century in position to control the vast majority of revenue from radiation oncology services to thousands of Medicare patients[4] each year within a major public healthcare system.

82.     Under the Agreement, 21st Century would bill and keep all revenue from outpatient radiation oncology services provided within one of the largest public healthcare systems in the United States.

83.     If 21st Century treated any indigent patients, Broward Health guaranteed payment to 21st Century.

84.     If 21st Century treated any inpatients, Broward Health also guaranteed payment to 21st Century.

85.     For both inpatients and indigent patients, Broward Health did not agree to only pay 21st Century for the professional physician fees. Rather, Broward Health agreed to pay 65 percent of the "Medicare allowable" global payments for particular cancer diagnoses.

86.     The deal was a "no lose" arrangement for 21st Century with a lucrative guaranteed upside as the exclusive radiation oncology provider within a major public hospital system.

### F. *Nask Pushed the Deal without the Usual Fair Market Valuations*

87.     Prior to entering into the Agreement with 21st Century in September 2011, Broward

---

[4]     Radiation oncology services are especially important to the Medicare patient population because cancer incidence increases with age.

Health did not obtain any independent fair market valuation of the economics of the deal, the premises, or the oncology equipment to be leased to 21st Century.

88.     Under the License Agreement, Broward Health granted a "license" to 21st Century for the use of 9,357 square feet at Broward General Medical Center and 9,140 square feet at the North Broward Medical Center. The aggregate space was approximately 18,497 square feet.

89.     According to the License Agreement, the premises included computers with "access to Broward Health's electronic medical records," "general office equipment" such as "copy machines, fax machines, and telephones," heating and ventilation equipment, and six pieces of radiation oncology equipment, including two Cyberknifes with a book value of $4 million, two Trilogy machines with book value of $2.4 million, and two IX machines with book value of $1.2 million. (See License Agreement, Par. 1(a)).

90.     The rental space is located inside Broward Health's two largest hospitals. The License Agreement states, "the Premises [are] part of an acute care hospital…" (See License Agreement, Section 1(b)).

91.     For the premises, the License Agreement requires 21st Century to pay monthly payments of $46,242.50, calculated at $30.00 per square foot. (See License Agreement, Par. 3(a)).

92.     The License Agreement also requires 21st Century to pay an "annual fee" for "licensing of the Equipment" in the amount of $380,000.00 each year with monthly installments of $31,666.67. (License Agreement, Par. 3 (c)).

93.     Only after entering into this deal did Broward Health obtain any supposed fair market valuations of the premises and equipment.

94.     Months after entering into the deal, Broward Health obtained two valuation opinions as to the premises. These opinions were two one-page letters written by David Burgess of Meridian

Realty Management.

95.     The first one-page letter is dated "January 2012" and contains "market estimates" as to the radiation oncology space on the first floor in the Broward General Physician Office Building. The letter states, "The figures are generated from current market conditions, current available offerings and actual building and operating costs." Yet the letter provides no data or specific information about current market conditions or current available offerings.

96.     The letter seems to disclaim any basis for reliability by stating, "This opinion should not be construed as an appraisal nor is the undersigned purported to be an appraiser."

97.     The second one-page letter dated March 14, 2012 addresses the Radiation Oncology space on the first floor of the North Broward Medical Center and contains similar statements about market estimates. The letter states, "The figures are generated from current market conditions, current available offerings and actual building and operating costs." This letter again provides no data or specific information about current market conditions or any current available offerings.

98.     This second letter also disclaims any basis for reliability by stating, "This opinion should not be construed as an appraisal nor is the undersigned purported to be an appraiser."

99.     Part of the space leased by Broward Health to 21st Century was "vault area" at both North Broward Medical Center and Broward General Medical Center. Vault space is where radiation treatment is provided. Such space must be constructed with high density concrete or special shielding.

100.    Any valuation of the Broward Health premises should include comparable lease rates for renting the radiation oncology infrastructure, equipment, general space, and vault space of a major public hospital system. The one-page "market estimate" letters made no such attempt to

valuate comparable lease arrangements.

101.    With respect to the radiation oncology equipment leased by Broward Health to 21st Century, the License Agreement states that the current value of the equipment was $7.6 million. Yet prior to entering the deal, Broward Health did not obtain any independent fair market valuation to determine the lease payments for the radiation equipment.

102.    Seven months after the Agreement was signed in September 2011, 21st Century hired Duff & Phelps to conduct a valuation of four "tangible assets" at Broward Health: two Linear Accelerators LINAC machines, Nucletron HDR Digital Planning System, and a Cyberknife Robotic Radiosurgery System.

103.    The date of the valuation report is April 3, 2012. The valuation estimate is $4,260,000 for these four machines.

104.    Without any bids or independent fair market valuations, a private company gained control of a major public hospital system's referral stream of cancer patients, the entire radiation oncology infrastructure of general space, vault space, and radiation equipment, and "Global Revenues" from treating such patients.

105.    The following paragraphs explain why this happened.

### G.  *Nask Sought to Hide the Extraordinarily Lucrative Deal*

106.    In 2013 and 2014, Nask was under increasing pressure from a federal investigation into Broward Health's physician contracts and physician payments.  Broward Health's compensation contracts with physicians were causing major losses being scrutinized by federal investigators.

107.    Nask knew that the 21st Century contract was also causing major financial losses to Broward Health as discussed in detail below. As the federal investigation intensified, he feared scrutiny of the 21st Century contract from the Department of Justice.

108.    In 2013 and 2014, Nask and 21st Century adjusted Broward Health's payments to 21st Century. Nask did not inform the Board of Broward Health's major losses under the 21st Century contract or why these changes to the contract terms were being made.

109.    Just over one year after signing the Amended Agreement in March of 2012, Broward Health and 21st Century entered into the First Amendment to Radiation Oncology Services Agreement dated April 11, 2013. The First Amendment changed Broward Health's payments to 21st Century for radiation oncology services provided to indigent patients and inpatients. Instead of Broward Health paying 65 percent of the global Medicare allowable rates for inpatients and indigent patients, the First Amendment required Broward Health to pay only 65 percent of the "Medicare Part B allowable." Medicare Part B generally covers physician fees and outpatient services.

110.    In 2014, Nask and 21st Century again adjusted the contract terms. On May 14, 2014, Broward Health and 21st Century entered into the Third Amendment to Radiation Oncology Services Agreement.

111.    In the Third Amendment, Broward Health and 21st Century changed the billing provisions for Medicare inpatients to state that Broward Health "shall collect for the technical (non-professional) component of Services rendered by the Specialists to Medicare inpatients, including the CT Services and Sedation Services." *See* Par. 5.3.2 of Third Amendment to Radiation Oncology Services Agreement.

### H. *The Contract Has Caused Major Losses to Broward Health*

112.    As mentioned above, in his memorandum to the Board urging approval of the contract on January 17, 2012, Nask stated, "This arrangement will allow Broward Health to reduce the present projected loss of providing the Radiation Oncology Service from the 2012 projected loss

of $3,254,940 to a loss of $1,100,000—an important improvement of approximately $2,100,000."

113.    On January 17, 2012, he told the Board: "With the new agreement with 21st Century, the program is projected to lose $1,100,000 per year. As the financial performance of 21[st] Century improves, the subsidy received from Broward is intended to decrease to $0."

114.    The source of Nask's financial data is unclear. According to Broward Health's annual cost reports[5] submitted to the Centers for Medicare and Medicaid Services ("CMS"), Nask's quoted numbers were inaccurate and unrealistic.

115.    The annual cost reports submitted by Broward Health to CMS contain detailed data about the charges and costs for particular services, including the charges and costs related to therapeutic radiology at Broward Health's four major hospitals. The following charges and costs were submitted and certified as accurate by Broward Health on its annual cost reports, Worksheet C, in 2012, 2013, 2014, and 2015.

116.    The 21st Century contract began in September 2011. In Fiscal Year ending June 30, 2012, Broward Health's four major hospitals—Broward General, North Broward Medical Center,

---

[5]    As a condition of payment by Medicare, CMS requires hospitals to submit annually a Form CMS-2552, more commonly known as the hospital cost report. A cost report is the final claim that a provider submits to the fiscal intermediary for items and services rendered to Medicare beneficiaries. After the end of each hospital's fiscal year, the hospital files its cost report with the fiscal intermediary, stating the amount of reimbursement the provider believes it is due for the year. *See* 42 U.S.C. § 13959g); 42 C.F.R. § 413.20.

Medicare relies upon the cost report to determine whether the provider is entitled to more reimbursement than already received through interim payments, or whether the provider has been overpaid and must reimburse Medicare. 42 C.F.R. §§ 405.1803, 413.60 and 413.64(f) (1). Medicare payments for inpatient hospital services are determined by the claims submitted by the provider for particular patient discharges (specifically listed on UB-04 Forms) during the course of the fiscal year. On the cost report, this Medicare liability for services is then totaled with any other Medicare liabilities to the provider. This total determines Medicare's true liability for services rendered to Medicare beneficiaries during the course of a fiscal year. From this sum, the payments made to the provider are subtracted to determine the amount due Medicare or the amount due the provider.

Coral Springs Medical Center, and Imperial Point Medical Center—generated gross charges for therapeutic radiology in the approximate amount of $32,309,134. Their reported costs for therapeutic radiology services were approximately $15,428,754.

117.    Gross hospital charges are not actual collections. Insurance companies, Medicare, and Medicaid do not pay gross charge amounts to hospitals. Rather, they pay discounted rates much lower than gross charges.

118.    For the Fiscal Year ending June 30, 2012, Broward Health on average collected 21 percent of gross charges. The actual revenues for therapeutic radiology services in that Fiscal Year were approximately $7,108.009.48 as compared to costs of $15,428,754.

119.    In the first year of the deal with 21st Century—Fiscal Year ending June 30, 2012— Broward Health had financial losses of approximately 8.3 million dollars for therapeutic radiology services.

120.    In the following year, Broward Health's financial losses continued. For Fiscal Year ending June 30, 2013, Broward Health's four major hospitals generated gross charges for therapeutic radiology in the approximate amount of $15,689,234. Their reported costs for therapeutic radiology services were approximately $10,330,420.

121.    For the Fiscal Year ending June 30, 2013, Broward Health on average collected 22 percent of gross charges. The actual revenues for therapeutic radiology services in that Fiscal Year were approximately $3,451,631 as compared to costs of $10,330,420.

122.    In the second year of the deal with 21st Century—Fiscal Year ending June 30, 2013— Broward Health had financial losses of approximately 6.8 million dollars for therapeutic radiology.

123.    In the third year of the deal with 21st Century—Fiscal Year ending June 30, 2014—

Broward Health's four major hospitals generated gross charges for therapeutic radiology in the approximate amount of $14,972,386. Their reported costs for therapeutic radiology services were approximately $9,595,046. For that Fiscal Year ending June 30, 2014, Broward Health on average collected 23% of gross charges.

*124.* The actual revenues for therapeutic radiology services in that Fiscal Year were approximately $3,443,648 but costs were much higher – $9,595,046. In that single year, Broward Health *lost approximately $6.1 million for therapeutic radiology services* under this contract.

125.   In the fourth year of the deal with 21st Century —Fiscal Year ending June 30, 2015— Broward Health's four major hospitals generated gross charges for therapeutic radiology in the approximate amount of $14,140,002. Their reported costs for therapeutic radiology services were approximately $7,941,343.

126.   For that Fiscal Year ending June 30, 2015, Broward Health on average collected nearly 24 percent of gross charges. The actual revenues for therapeutic radiology services in that Fiscal Year were approximately $3.4 million as compared to costs of $7.9, a loss of approximately $4.5 million for therapeutic radiology services.

127.   Contrary to what Nask represented to the Board, under the deal with 21st Century, Broward Health lost approximately $8.3 million in 2012, $6.8 million in 2013, $6.1 million in 2014, and $4.5 million in 2015 for radiation oncology services.

128.   Under the deal with 21st Century Oncology, since September of 2011, Broward Health has lost over $30 million. Over the course of the potential 25-year term of the contract, Broward Health is on track to lose over $125 million.

### I.   21st Century Orchestrated Kickbacks

129.   21st Century obtained this extraordinary deal by orchestrating illegal kickbacks discussed in detail below.

130.   Nask was appointed Broward Health's CEO in 2007 under the prior administration of Florida Governor Charlie Crist. In 2010 Republican Rick Scott was elected Governor of Florida.

131.   In 2011, Nask's employment as CEO was in jeopardy.  In May of 2011, numerous media organizations reported that the Federal Government was investigating Broward Health's contracts with 27 employed physicians.

132.   Nask was several years away from retirement and enjoyed his power, compensation, and benefits as CEO. His career options were limited due to his age and the ongoing federal investigation.

133.   In the summer of 2011, 21st Century paid a lobbyist named Bill Rubin to approach Nask with a "proposal."  21st Century hired Rubin because he was and is a close personal friend of Governor Scott.[6]

134.   In the summer of 2011, Rubin approached Nask on behalf of his client, 21st Century. Rubin told Nask that he controlled appointments to the Broward Health Board and he urged Nask to award a lengthy exclusive contract for radiation oncology services to 21st Century. In exchange, Rubin promised Nask that the appointments to the Broward Health Board would protect Nask's continuing employment, salary, and pension as CEO.

135.   Rubin also communicated the message to Nask that if he did not support the contract with 21st Century, then the appointments to the Board would not be his allies and his employment

---

[6]     In November 2010, Mr. Rubin was quoted in the Tampa Bay Times as stating, "I got to know Rick in 1991 when he started his hospital company, and we've stayed close ever since. I love him," "He's a very good friend. We've stayed in touch ever since."

would be terminated.

136.   Nask's annual salary was approximately $680,000 plus performance bonuses, pension, and benefits. By working several more years he increased the retirement benefits he would receive annually for the rest of his life. He needed allies with the pending federal investigation. Nask agreed to Rubin's demands made on behalf of 21st Century.

137.   Executives at 21st Century hired and paid Rubin to make this deal with Nask and to offer political protection and financial security for Nask in exchange for an exclusive prized contract valued at hundreds of millions of dollars over 25 years. Executives at 21st Century were fully aware and complicit in this kickback scheme.

138.   Only years later did Di Pietro learn the truth about the kickbacks and economics of the deal to give 21st Century control over all radiation oncology services and billings at Broward Health.

139.   To understand the 21st Century contract and the kickbacks arranged for that contract requires an understanding of events leading up to the fall of 2011.

140.   Di Pietro first met Rubin in 2010. As of 2010, Rubin was a long-time Democrat. When Rick Scott announced he was running for Governor in 2010, Rubin changed his and his wife's political affiliation to Republican.

141.   Di Pietro briefly met Rubin at a Scott fundraiser hosted by Rubin, William Scherer, and Doug Von Alman. This fundraiser was before the primary and Scott was a "long shot" for governor at that time. Although the event was poorly attended, it raised over $60,000. At this time, Di Pietro became a supporter of Scott for governor.

142.   Di Pietro worked at Scherer's law firm, Conrad & Scherer, from 2008 until August of 2011. Prior to working for Conrad & Scherer, Di Pietro worked as a prosecutor at the Broward

State Attorney's Office from May of 2005-April 2008.

143.    In August of 2011, Di Pietro decided to leave Conrad & Scherer to form his own law firm. Scherer encouraged him to apply for a Commissioner position at Broward Health and advised him that he would speak with Rubin because Rubin was "controlling all appointments" to the Broward Health Board.

144.    Rubin and Di Pietro met at Timpano's restaurant in Fort Lauderdale on August 29, 2011.

145.    At this lunch meeting, Rubin told Di Pietro that he was "controlling the appointments" for the Broward Health Board.

146.    Rubin also told Di Pietro that he "need[ed]" something "very important" from Di Pietro. Rubin told Di Pietro that he needed his support for a contract on behalf of his long-time client, 21st Century Oncology, with Broward Health.

147.    At the time, Di Pietro was not a member of the Board at Broward Health, he had no background or experience in healthcare, and he was not familiar with 21st Century.

148.    At this first lunch meeting, Rubin told Di Pietro that he did not like Nask and Sam Goren, Broward Health's General Counsel. One of the main reasons that Rubin didn't like Nask and Goren was because after Scott won the Republican Primary, Nask and Goren convinced Broward Health's Board to privatize so that the Governor would be unable to make selections to the Board after he won the election. That plan to privatize Broward Health was approved by the Board but then reversed in the fall of 2010.

149.    Rubin told Di Pietro that he had previously tried to get 21st Century a contract with Broward Health, but was unsuccessful. Rubin also told Di Pietro that the owner of 21st Century, Dr. Daniel Dosoretz, was a "close friend" of Governor Scott and a major financial contributor to his campaign and securing the 21st Century contract with Broward Health was a "top priority."

150.    Rubin also informed Di Pietro that the current oncology company, HealX Oncology and its owner Dr. Anarag Agarwal, were supporters of the prior Governor and were not in favor with Governor Scott.

151.    In the days after the lunch meeting, Rubin told Scherer that he would support Di Pietro's application with the Governor's office for the Broward Health Board of Commissioners.

152.    On September 9, 2011, Governor Scott appointed Di Pietro to the Broward Health Board. Rubin and his office sent Di Pietro a congratulatory e-mail and Di Pietro responded, thanking Rubin for the appointment.

153.    Between September 2011 and January 2012, Di Pietro communicated several times with Rubin regarding 21st Century's contract with Broward Health as well as other issues related to Nask and Goren.

154.    As discussed above, in January of 2012, Di Pietro and the other Broward Health Commissioners did not receive accurate information about the economics of the 21st Century contract and the hush moneys paid to HealX. Based on misinformation, the Board voted 6-1 in favor of the contract with only Commissioner Clarence McKee voting "no" because the contract was awarded without bids.

155.    After Nask secured the contract's formal approval from the Board, Rubin changed his attitude about Nask. In the subsequent months and years, Rubin repeatedly told Di Pietro to support Nask in "all possible ways."

156.    In and around the fall of 2012, the Broward Health Board attended a legislative trip to Tallahassee for issues related to Broward Health. Broward Health Commissioner Clarence McKee was a close friend with the then Lieutenant Governor, Jennifer Carroll.

157.    McKee voiced his disgust with Rubin's influence over the Broward Health Board to the

Lieutenant Governor and others in the Governor's Office.

158.    After that occurred, Rubin contacted Di Pietro by phone, telling him how upset he was by McKee's statements to the Lieutenant Governor and others in the Governor's office and that McKee's statements made their way back to the Governor.

159.    In approximately March of 2012, a colleague of Di Pietro's called the Lieutenant Governor to advise her that Rubin was using undue influence and political patronage to appoint Commissioners to the Broward Health Board in order to get his clients' contracts approved. Around this time, Governor Scott contacted Di Pietro directly by phone the day he was interviewing two potential board members.

160.    Di Pietro told Governor Scott that Nask and Rubin were hand-picking "candidates" to be appointed to the Broward Health Board and that the two interviews he had that day were not independent candidates; rather they would be doing the bidding for Nask and Rubin. Governor Scott acted upset but he ignored Di Pietro's concerns. Governor Scott continued to follow Rubin's lead in appointments to the Board.

161.    On March 27th, 2012, Rubin invited Di Pietro to lunch at YOLO Restaurant in Fort Lauderdale. Rubin expressed frustration at Di Pietro for contacting the Governor about "my appointments" to the Broward Health Board. Rubin warned Di Pietro that he had made a "mistake" by contacting the Governor, but offered to "move forward as a team."

162.    In the summer of 2012, Di Pietro learned of the payouts to HealX from a spreadsheet prepared by a Broward Health internal auditor, Maria Panyi.

163.    Ms. Panyi had discovered the three checks for $830,000 that Nask arranged to be paid to HealX in September of 2011 and she reported these payments to Di Pietro.

164.    In the summer of 2012, Di Pietro learned that on September 8, 2011, the day before he

was appointed to the Board, Nask arranged for a payment in the amount of $330,000 to HealX for alleged medical "directorship" fees from 2008-2011. Di Pietro also learned that this payment was in excess of the CEO's signing authority of $250,000.

165.    When Di Pietro learned of this payout, he requested hourly time sheets or logs for "director" services, but Broward Health had no such records in August 2012.

166.    Di Pietro also learned of two more payments made by Broward Health to HealX: $250,000 for "terminating the agreement pursuant to Section 3.1" and another $250,000 for a purported 18-month non-compete agreement related to "the proton beam project."

167.    As discussed above, there was no need for a non-compete agreement because there were no other proton beam radiation machines in Broward Health's geographical governing district of northern Broward County. Broward Health never purchased the proton beam radiation machine that it was supposedly attempting to protect.

168.    The non-compete agreement was a sham payment to HealX as hush money to secure its acquiescence in the termination of its contract that would allow Nask to consummate the 21st Century deal.

169.    Di Pietro requested all fair market valuations used in deciding to make the payouts to HealX. Broward Health did not have any fair market valuations obtained prior to paying $830,000 to HealX in September 2011.

170.    In the fall of 2012, Di Pietro had several meetings and telephone conferences with Rubin. Rubin told Di Pietro not to discuss or investigate the HealX payouts because the issue would "hurt" Nask, 21st Century Oncology, and Governor Scott.

171.    Di Pietro met with Rubin in the afternoon prior to the August 2012 Broward Health Legal Review Committee meeting. Rubin urged Di Pietro to be silent on the issue of payouts to HealX.

172.    Nevertheless, Di Pietro continued to question the payments at Board meetings and he made a formal complaint with Broward Health's Compliance Officer on August 19, 2012. On that date, Di Pietro sent an email to Broward Health's Compliance Officer, Donna Lewis, and asked her to investigate why $830,000 was paid to HealX in September 2011 after the contract was terminated.

173.    In his email to Ms. Lewis on August 19, 2012, Di Pietro wrote:

> I have major concerns as to the commercial reasonableness of signing two amendments to an agreement with HealX in July of 2011 and terminating the agreement less than 2 months later, which resulted in $500,000 in penalties. Also, for reasons unknown, Broward Health paid $330,000 to HealX for a purported medical directorship dating back to 2008. This begs a major question: why did we wait to pay HealX for its medical directorship until we terminated the entire agreement?
>
> Also, I requested, but never received, the time sheets for this purported medical directorship. Further, the $333,000.00 paid is outside of Frank Nask's signing authority.
>
> On a side note, this 'verbal' FMV that was obtain[ed] by Broward Health is highly suspicious in my estimation. Why would we be only obtaining 'verbal' FMVs at a time when we are already under an OIG investigation? Finally, the Fifth Amendments to the HealX agreement were not approved by our legal department. These are all major red flags in my eyes.

174.    At the Board meeting on August 29, 2012, Di Pietro stated that the "missing time sheets" and "not having a written FMV on file were major compliance issues."

175.    One of Nask's allies made a motion to silence Di Pietro by requiring Board approval of all items on the Legal Affairs Committee agenda before such items are brought to the Board for public discussion. Di Pietro was the Chair of the Legal Affairs Committee.

176.    Nask orchestrated this motion so that Di Pietro wouldn't bring up more compliance issues related to the 21st Century contract or the HealX contract and hush moneys.

177.    Di Pietro voiced his opinion that "the motion was clearly made to silence [him]" and he would resign as Chair of the Legal Affairs Committee if the motion passed. The motion failed by

one vote.

178.    On September 6, 2012, Rubin and Di Pietro met again at YOLO restaurant. Rubin sought to instruct Di Pietro to be a "team player" and "support [him] and the governor." Rubin also told Di Pietro again to support Nask.

179.    In 2013, Rubin and Di Pietro met periodically and discussed matters related to Broward Health.  Rubin continued to urge Di Pietro to support Nask.

180.    Rubin also asked that Di Pietro meet with Nask and Dr. Dosoretz, CEO of 21st Century, and a local representative from the company regarding the expansion for cancer treatment and the potential purchase of a proton beam radiation machine by Broward Health. This meeting occurred in 2013. At this meeting Dr. Dosoretz told Di Pietro about his "*close relationship with the Governor*" and how he was going "*to fund his re-election*" and that Broward Health was a "strong partner."

181.    Dosoretz also advised Di Pietro that he was arranging for meetings with Nask and Governor Scott so that "the Governor would know that Frank [Nask] is a good guy." One such meeting occurred at Ruth Chris Steakhouse in Naples, Fla.

182.    Prior to the Governor's re-election in 2014, Nask told Di Pietro that Dosoretz was a "powerful and influential person with the Governor" and "we needed to stay on his good side."

183.    During this time period it became clear to Di Pietro that Nask had received political protection for his job security (income, pension and benefits) as CEO in exchange for 21st Century gaining control of Broward Health's referral stream of cancer patients.  But Di Pietro did not learn the truth about the economics of the deal until the spring of 2016.

### J.  *21st Century's Continuing Scheme to Protect the Illegal Contract*

184.  In the summer of 2014, Nask saw an opportunity to escape the kickback control of 21st Century: Charlie Crist was in position to win the election for Florida Governor against Rick Scott.

185.  In the summer of 2014, Nask planned to leak information about the federal investigation to the press or settle the case prior to the election in an effort to publicly damage Governor Scott and help Crist's campaign for governor. Such leaks and settlement would tarnish Governor Scott's image and re-election campaign because (1) he appointed multiple Commissioners on the Broward Health Board; and (2) he was the former CEO of Columbia/HCA who resigned in 1997 amidst an FBI probe that ultimately led to the company paying $1.7 billion in civil and criminal fines for Medicare fraud, including kickbacks to physicians for referrals.[7]

186.  In the summer of 2014, Rubin learned of Nask's plan to leak information harmful to Scott. Rubin told Di Pietro to "squash Nask like a bug" and "have him fired." Rubin feared losing leverage over Nask if Governor Scott was not re-elected and he feared losing protection of the 21st Century contract. Governor Scott would later win re-election in November 2014 by a margin of only 1 percent of votes.

187.  Di Pietro recommended Dr. Nabil El Sanadi as the next Chief Executive Officer at Broward Health.

188.  Rubin demanded reassurance that Dr. El Sanadi would support Broward Health's contract with 21st Century.

189.  Rubin pushed Governor Scott for two appointments to the Board of Commissioners,

---

[7]      As part of the settlements, in 2001, Columbia/HCA pled guilty to one count of conspiracy to pay kickbacks and other monetary benefits to doctors in violation of the Anti-Kickback Statute and paid a $30 million criminal fine.

Maureen Canada and Sheela Van Hoose, who knew and supported Dr. El Sanadi. Governor Scott appointed them both to the Broward Health Board prior to the Board's approval of Dr. El Sanadi as CEO.

190.   After the Board approved El Sanadi as CEO, Rubin communicated to El Sanadi that he was indebted to Rubin for his appointment as CEO. Rubin told El Sanadi that he orchestrated the two newly appointed Commissioners who each agreed to support. El Sanadi's appointment as CEO.

191.   In late 2014 and early 2015, Di Pietro discussed with El Sanadi the unfortunate reality of political control at Broward Health. Di Pietro told El Sanadi that as the Broward Health CEO, he would face the challenge of working closely with Rubin and he would face Rubin's demands to protect and favor 21st Century.

192.   The message to El Sanadi was clear: Rubin orchestrated his appointment as Broward Health CEO and Rubin required him to protect the 21st Century contract in exchange.

193.   Nask continued to serve as CEO of Broward Health until he "retired" in December of 2014.

194.   Rubin lobbied Di Pietro for the Board to give Nask a "generous" severance package. Broward Health paid Nask a full-year of compensation after his retirement.

195.   After Dr. El Sanadi was approved by the Board to serve as CEO, Rubin called Di Pietro and scheduled a meeting with Dr. El Sanadi, Dr. Dosoretz, CEO of 21st Century, and another lobbyist named Jim Eaton, at Di Pietro's office on January 19, 2015.

196.   During this meeting, Eaton stated that 21st Century had spent years attempting to obtain this contract from Broward Health and "since Dr. Dosoretz and Bill Rubin were personal friends of the Governor, it was going to happen no matter what."

197.    During this meeting, Dosoretz bragged about his "close friendship" with Governor Scott and stated that he frequently had "private meetings" with him.

198.    Dosoretz also urged El Sanadi to give more business to 21st Century and asked El Sanadi to arrange for Broward Health to purchase chemotherapy as a 340B entity to save 21st Century monies on these drugs.[8]

199.    After that meeting, El Sanadi and Rubin met or spoke on a weekly basis about issues related to Broward Health.

200.    On January 23, 2016, El Sanadi tragically committed suicide.

### K.  *Current Political Shenanigans with the Governor's "Investigation" of Broward Health*

201.    Six days after Dr. El Sanadi's death, Di Pietro received a letter from Melinda Miguel, Chief Inspector General, Executive Office of the Governor. In this letter, Ms. Miguel stated, "I have received Governor Scott's full support to conduct a thorough review of every contract North Broward Hospital District/Broward Health has entered since July 1, 2012 and all correspondence, in any form, related to these contracts."

202.    The cutoff date of contracts to be reviewed by the Governor's Chief Inspector General is no coincidence. Broward Health originally entered the contract with 21st Century in September 2011.

203.    Under the Inspector General's cutoff date of July 1, 2012, the 21st Century contract with

---

[8] The 340B Drug Pricing Program requires drug manufacturers to provide outpatient drugs to eligible health care organizations/covered entities at significantly reduced prices. Only nonprofit health care organizations that have certain Federal designations or receive funding from specific Federal programs are eligible organizations (covered entities) that can register, be enrolled and purchase discounted drugs through the 340B Program.
    21st Century is *not* a non-profit organization so it is not qualified to participate in the 340B Drug Pricing Program. Dr. Dosoretz sought to circumvent the eligibility rules and urged Broward Health to purchase these drugs at a discount for use by 21st Century.

Broward Health would not be reviewed. There would be a public appearance of an investigation by the Governor's Office but the 21st Century contract would escape review.

204.    On March 18, 2016, Ms. Miguel submitted a letter to Governor Scott accusing Di Pietro and another Board member, Darryl Wright, of somehow interfering with her investigation by hiring outside legal counsel for the Board. Within minutes of receiving this letter and without giving Di Pietro an opportunity to respond, Governor Scott suspended Di Pietro and Wright for "acts of malfeasance."

205.    On March 22, 2016, Di Pietro filed a Petition for Writ of Quo Warranto in the Circuit Court for the 17th Judicial Circuit for Broward County. This Petition requested Di Pietro's reinstatement as a Broward Health Commissioner.

206.    On April 8, 2016, Judge Phillips of the 17th Judicial Circuit held a hearing on Di Pietro's Petition. Three days later, Judge Phillips granted the Petition to restore Di Pietro to the Broward Health Board. Judge Phillips found the Governor's Executive Order and the Letter from Ms. Miguel "are devoid of any specific acts of malfeasance as it relates to" Di Pietro. *See* Final Order Granting Amended Petition for Writ of Quo Warranto, pp. 3-4. "Further, reviewing the letter, *in toto*, reveals no allegations that bear a reasonable relation to the charge made against" Di Pietro. *Id.* at 4-5.

207.    On April 14, 2016, Di Pietro resigned from the Board.

## IV.    The Law

### A. *The False Claims Act*

208.    The False Claims Act establishes liability, *inter alia,* for anyone who "knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1)(A), or

"knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," 31 U.S.C. § 3729(a)(1)(B), or "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation9 to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G).

209. "The term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). A violation of the Anti-Kickback Statute is material to the government's decision to pay, and a violation of the Anti-Kickback Statute renders resulting claims to Federal Healthcare Programs false in violation of the False Claims Act.

210. The False Claims Act defines "claim" to include "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that…is presented to an officer, employee or agent of the United States…or is made to a contractor, grantee or other recipient, if the money or property is to be spent on the Government's behalf or to advance a Government program, and if the United States Government…provides or has provided any portion of the money or property requested or demanded…or will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2).

211. Statutory liability under the False Claims Act includes a civil penalty "not less than

---

9     The False Claims Act defines "obligation" as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3).

$5,500 and not more than $11,000" per false claim "plus 3 times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C. § 3729(a).

212.    Under the Federal False Claims Act, "'knowing' and 'knowingly' mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and require no proof of specific intent to defraud." 31 U.S.C. 3729 (b)(1).

213.    In considering the requisite *scienter* which subjects a defendant to liability under the False Claims Act, "no proof of specific intent to defraud" is required. *Id.* Under the False Claims Act, a defendant is liable for acting in "reckless disregard of the truth or falsity of the information" or acting in "deliberate ignorance of the truth or falsity of the information." *Id.*

214.    Protection of the public treasury requires that those who seek public funds act with scrupulous regard for the requirements of law. Participants in Federal Healthcare Programs have a duty to familiarize themselves with the legal requirements for payment and ensure compliance.

215.    The Supreme Court has affirmed an expansive reading of the FCA to "reach all types of fraud, without qualification, that might result in financial loss to the government."

### B. *The Federal Anti-Kickback Statute*

216.    The Federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), arose out of Congressional concern that kickbacks to those who can influence health care decisions corrupt medical decision-making and can result in goods and services being provided that are medically unnecessary, too costly, of poor quality or even harmful to a vulnerable patient population.

217.    To protect the integrity of federal health care programs, Congress enacted a *per se* prohibition against kickbacks in any form, regardless of whether the particular kickback gave rise

to overutilization or poor quality of care.

218. The Anti-Kickback Statute was enacted in 1972 "to provide penalties for certain practices which have long been regarded by professional organizations as unethical, as well as unlawful...and which contribute appreciably to the cost of the Medicare and Medicaid Programs." *See* H.R. Rep. No. 92-231, 92nd Cong., 1st Sess. 108 (1971), reprinted in 1972 U.S.C.C.A.N. 4989, 5093.

219. First enacted in 1972, Congress strengthened the statute in 1977 and 1987 to ensure that kickbacks masquerading as legitimate transactions did not evade its reach. *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Anti-fraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

220. In 1977, Congress amended the Anti-Kickback Statute to prohibit paying or receiving "any remuneration" to induce referrals and increased the crime's severity from a misdemeanor to a felony with a penalty of $25,000 and/or five years in jail. *See* Social Security Amendment of 1972, Pub. L. No. 92-603, 241 (b) and (c); 42 U.S.C. § 1320a-7b.

221. The Anti-Kickback Statute prohibits any person or entity from offering or paying "any remuneration...directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to...refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b).

222. The Anti-Kickback Statute has two separate liability provisions, the violation of *either* of which subjects a person to liability. *See* 42 U.S.C. § 1320a-7b(b)(1)(A) (prohibiting the solicitation and receipt of remuneration in exchange for referrals; 42 U.S.C. §1320a-7b(b)(2)(A)

(prohibiting the offer or payment of remuneration to induce referrals).

223.    The Anti-Kickback Statute is violated if a party or entity offers remuneration to induce referrals even if the intended target is not actually induced. *See* 42 U.S.C. §1320a-7b(b)(2)(A) (prohibiting the offer or payment of remuneration for the purpose of inducing referrals).

224.    The OIG Anti-Kickback Provisions, 56 Fed. Reg. 35952, 35958 (1991), define "remuneration" as "anything of value in any form whatsoever." The Department of Health and Human Services Office of the Inspector General (HHS- OIG) has repeatedly confirmed that "remuneration" means "anything of value." *See, e.g.*, Safe Harbor Provisions Under the Anti-Kickback Statute, 64 Fed. Reg. 63518 (1999), and HHS OIG Fact Sheet: Federal Anti-kickback Law and Regulatory Safe Harbors (Nov. 18, 1999).[10]

225.    Under federal law, if any one purpose of remuneration is to induce or reward referrals, the Anti-Kickback Statute is violated.

226.    Effective March 23, 2010, the Patient Protection and Affordable Care Act changed the language of the Anti-Kickback Statute to provide that claims submitted in violation of the statute automatically constitute false claims for purposes of the False Claims Act. The new language provides that "a claim that includes items or services resulting from a violation of [the Anti-Kickback Statute] constitutes a false or fraudulent claim for purposes of subchapter III of chapter 37 of Title 31 [the False Claims Act]." 42 U.S.C. § 1320a-7b(g).

227.    Congress also added a new section that eliminates the requirement that a person have actual knowledge of the law or specific intent to commit a violation of the statute. *See* 42 U.S.C. § 1320a-7b(h).

228.    Federal courts have held that because Anti-Kickback Statute violations render the

---

[10]     http://www.oig.hhs.gov/fraud/docs/safeharborregulations/safefs.htm

providers ineligible for compensation, they are not entitled to any reimbursement, even for non-fraudulent services performed.

### C. *Federal Healthcare Program Overview*

#### 1. *The Medicare Program*

229.    Federal Healthcare Programs include patients covered under the Medicare, Medicaid, and Tri-Care Programs discussed below in addition to federal employees and retired federal employees.

230.    Since 2011, 21st Century has received substantial revenues from the Medicare Program arising from treatment of cancer patients at Broward Health's hospitals and facilities.

231.    Between 2011 and the present, 21st Century has submitted thousands of claims tainted by kickbacks for radiation oncology services at Broward Health.

232.    In 1965, Congress enacted Title XVIII of the Social Security Act (Medicare) to pay for the cost of certain medical services for persons aged 65 years or older and those with disabilities.

233.    The Medicare Program is divided into four parts. Medicare Part A authorizes payment for institutional care, including hospital, skilled, nursing facility, and home health care. See 42 U.S.C. §§ 1395c-1395i-4. Part B of the Medicare Program authorizes payment for outpatient health care expenses, including physician fees. *See* 42 U.S.C. §§ 1395-1395w-4.

234.    HHS is responsible for the administration and supervision of the Medicare Program. The Centers for Medicare and Medicaid Services ("CMS") is an agency of HHS and is directly responsible for the administration of the Medicare Program.

235.    Under the Medicare Program, CMS makes payments retrospectively to providers for patient services. Medicare enters into provider agreements with medical providers to establish their eligibility to participate in the Medicare Program.

236.     Compliance with the Anti-Kickback Statute is a mandatory material condition of payment by the Medicare Program.

237.     The Medicare Program requires every provider who seeks payment from the Program to promise and ensure compliance with the Anti-Kickback Statute and with other federal laws governing the provision of healthcare services in the United States.

238.     The enrollment application that providers must execute to participate in the Medicare Program contains the following certification:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. **I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including but not limited to, the Federal anti-kickback statute and the Stark law),** and on the provider's compliance with all applicable conditions of participation in Medicare."

(Emphasis added).

239.     21st Century has executed at least one provider agreement with CMS in which it agreed to abide by the Medicare laws, regulations and program instructions..." CMS Provider/Supplier Enrollment Application Forms 855-A and 855-B. 21st Century expressly certified its understanding "that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulation and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law)..." *Id.*

240.     To assist in the administration of Medicare Part A, CMS contracts with "fiscal intermediaries." 42 U.S.C. § 1395h. Fiscal intermediaries, typically insurance companies, are responsible for processing and paying claims and auditing cost reports.

241.     Providers submit claims for interim reimbursement for items and services delivered to Medicare beneficiaries during their hospital stays. 42 C.F.R. §§ 413.1, 413.60, 413.64.

242.    Upon discharge of Medicare beneficiaries from a hospital, the medical provider submits claims for interim reimbursement for items and services provided to those beneficiaries during their hospital stays. See 42 C.F.R. §§ 413.1, 413.60, 413.64. Medical providers submit patient-specific claims for interim payments electronically on a CMS UB-04 Form.

243.    The UB-04 Form contains the following notice in bold capital letters:

> THE SUBMITTER OF THIS FORM UNDERSTANDS THAT MISREPRESENTATION OR FALSIFICATION OF ESSENTIAL INFORMATION AS REQUESTED BY THIS FORM, MAY SERVE AS THE BASIS FOR CIVIL MONETARY PENALTIES AND ASSESSMENTS AND MAY UPON CONVICTION INCLUDE FINES AND/OR IMPRISONMENT UNDER FEDERAL AND/OR STATE LAW(S).

244.    The UB-04 Form requires the provider to certify the following:

> Submission of this claim constitutes certification that the billing information as shown on the face hereof is true, accurate and complete. That the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts.

> For Medicaid Purposes: The submitter understands that because payment and satisfaction of this claim will be from Federal and State funds, any false statements, documents, or concealment of a material fact are subject to prosecution under applicable Federal or State Laws.

> For TRICARE Purposes: The information on the face of this claim is true, accurate and complete to the best of the submitter's knowledge and belief, and services were medically [sic] and appropriate for the health of the patient.

245.    Under the contract, 21st Century provided radiation oncology services to thousands of patients through the Broward Health system. Part of the costs for such services were included on Broward Health's annual hospital cost reports submitted to CMS.

246.    As discussed above, as a condition of payment by Medicare, CMS requires hospitals to submit annually a Form CMS-2552, more commonly known as the hospital cost report.

247.    Each hospital cost report contains a "Certification" that must be signed by the chief administrator of the hospital provider or a responsible designee of the administrator.

248.    For each of the Fiscal Years between 2011 and the present, each cost report certification

page submitted by Broward Health included the following notice:

> Misrepresentation or falsification of any information contained in this cost report may be punishable by criminal, civil, and administrative action, fine and/or imprisonment under Federal law. **Furthermore, if services provided in this report were provided or procured through the payment directly or indirectly of a kickback or were otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result**.

(Emphasis added).

249.    On each cost report for each Fiscal Year from 2011 through the present, the responsible

officer on behalf of Broward Health was required to certify, in pertinent part, as follows:

> I hereby certify that I have read the above statement [paragraph above] and that I have examined the accompanying electronically filed or manually submitted cost report….and that to the best of my knowledge and belief, it [the cost report] is a true, correct, and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted. **I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.**

(Emphasis added).

250.    Broward Health was required to certify that their filed cost reports were:

   i.    truthful, *i.e.,* that the cost information contained in the report is true and accurate,

   ii.   correct, *i.e.,* that the provider is entitled to reimbursement for the reported costs in accordance with applicable instructions,

   iii.  complete, *i.e.,* that the cost report is based upon all knowledge known to the provider,

   iv.   **that the services provided in the cost report were not linked to kickbacks, and**

   v.    **that the provider complied with laws and regulations regarding the provision of health care services, such as the *Stark* and Anti-Kickback Statutes.**

251.    In the months following the end of each fiscal year, Broward Health submitted annual

cost reports to CMS and attested to the certifications stated above. Broward Health has submitted

cost reports with the certifications stated above for Fiscal Years 2011, 2012, 2013, 2014, and 2015. The certifications submitted by Broward Health to CMS were false due to 21st Century's kickback scheme.

252.     In addition to the in-patient fees billed by hospitals, physicians also separately bill for their services provided to Medicare patients under Part B. Physicians and physician groups submit Form CMS-1500 for this purpose.

253.     Form CMS-1500 requires the physician to certify that he or she "understand(s) that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws."

254.     By submitting CMS-1500 forms, physicians and physician groups certify that they are eligible for participation in the Medicare Program, and that they have complied with all applicable regulations and laws governing the Program, including the Anti-Kickback Statute.

### 2.  *Medicaid Program*

255.     The Medicaid Program is a joint federal-state program that provides health care benefits primarily for the poor and disabled. Medicaid is authorized under Title XIX of the Social Security Act and is administered by each State in compliance with Federal requirements specified in the Medicaid statute and regulations. "The States operate Medicaid programs in accordance with Federal laws and regulations and with a State plan that we approve." 66 Federal Register 857.

256.     The Federal Medicaid statute sets forth certain minimum requirements for state Medicaid programs to qualify for federal funding, which is called federal financial participation (FFP). 42 U.S.C. §§1396, *et seq*. As part of such minimum requirements, each state's Medicaid program

must cover hospital and physician services. 42 U.S.C. § 1396a (10)(A), 42 U.S.C. § 1396d (a)(1)-(2), (5).

257.    The Federal matching rate for the Florida Medicaid Program is approximately 61 percent.

258.    Compliance with the Anti-Kickback Statute is also a mandatory material condition of payment by the Medicaid Program. 42 U.S.C. § 1320a-7b (b).

### 3. *TRICARE*

259.    21st Century also enrolled in and sought payments from the Civilian Health and Medical Program of the Uniformed Services, known as TRICARE Management Activity/CHAMPUS ("TRICARE/CHAMPUS").

260.    TRICARE is a federally-funded program that provides medical benefits, including hospital services, to certain relatives of active duty, deceased, and retired service members or reservists, as well as to retirees. TRICARE sometimes provides for hospital services at non-military facilities for active duty service members as well. 10 U.S.C. §§ 1071-1110; 32 C.F.R. § 199.4(a).

261.    21st Century received revenue from the TRICARE Program for the treatment of covered cancer patients at Broward Health.

### V.    Counts under the Federal False Claims Act

#### A. *Causing False Claims, 31 U.S.C. § 3729(a)(1)(A)*

262.    Relator repeats and realleges the allegations and statements contained in all of the preceding paragraphs as though fully set forth herein.

263.    In pertinent part, the False Claims Act establishes liability for "any person who…knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A).

264.    21st Century knowingly or in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, presented or caused to be presented false claims "for payment or approval" to the United States in violation of 31 U.S.C. § 3729(a)(1)(A).  Such false claims arose from radiation oncology services at Broward Health from September 2011 through the present and include claims submitted by 21st Century and claims submitted by Broward Health to Federal Healthcare Programs.

265.    This is a claim for treble damages and penalties under the Federal False Claims Act, 31 U.S.C. § 3729, *et seq.*, as amended.

266.    Through the acts described above, 21st Century knowingly or in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, presented or caused to be presented, false claims to officers, employees or agents of the United States Government, within the meaning of 31 U.S.C. § 3729(a)(1)(A).

267.    The United States was unaware of the falsity of the records, statements and claims made or caused to be made by 21st Century. In reliance on the accuracy of the claims, information, records, and certifications submitted by 21st Century, the United States paid and continues to pay claims that would not be paid if Defendant's unlawful conduct was known to the United States.

268.    As a result of the Defendant's acts, the United States has sustained damages, and continues to sustain damages, in a substantial amount to be determined at trial.

269.    Additionally, the United States is entitled to a civil penalty of between $5,500 and $11,000 for each false claim made or caused to be made by Defendants arising from their unlawful conduct as described herein.

## B. *Making False Statements, U.S.C. § 3729(a)(1)(B)*

270.    Relator repeats and realleges the allegations and statements contained in all of the

preceding paragraphs as though fully set forth herein.

271.    In pertinent part, the False Claims Act establishes liability for "any person who…knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B).

272.    This is a claim for treble damages and penalties under the Federal False Claims Act, 31 U.S.C. § 3729, *et seq.*, as amended.

273.    Through the acts described above, 21st Century knowingly made, used, or caused to be made or used, false records and statements. Through the acts described above, 21st Century knowingly made, used, or caused to be made or used, false records and statements, and omitted material facts, to get false claims paid or approved, within the meaning of 31 U.S.C. § 3729(a)(1)(B). The records were false in that they purported to show compliance with the Anti-Kickback Statute.

274.    21st Century knowingly made, used, or caused to be made or used false records or statements with the intent to get or cause these false claims to be paid by the United States. The statements were made knowingly because 21st Century knew, or in the exercise of reasonable care should have known that its kickback scheme violated the federal Anti-Kickback Statute.

275.    The United States was unaware of the falsity of the records, statements, certifications, and claims made or caused to be made by 21st Century. The United States paid and continues to pay claims that would not be paid if Defendant's unlawful conduct was known.

276.    By virtue of the false records and false claims made or caused by 21st Century, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act to be determined at trial.

277.    Additionally, the United States is entitled to civil penalties between $5,500 and $11,000

for each false claim made and caused to be made by 21st Century Oncology arising from their unlawful conduct as described herein.

### C.  *Conspiring to Submit False Claims, 31 U.S.C. § 3729(a)(1)(C)*

278.    Relator repeats and realleges the allegations and statements contained in all of the preceding paragraphs as though fully set forth herein.

279.    In pertinent part, the False Claims Act establishes liability for "any person who....conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G)." 31 U.S.C. § 3729(a)(1)(C).

280.    This is a claim for penalties and treble damages under the False Claims Act, 31 U.S.C. § 3729, *et seq.*, as amended.

281.    Through the acts described above, 21st Century acting in concert other contractors, agents, partners, and/or representatives, conspired to knowingly present or cause to be presented, false claims to the United States and knowingly made, used, or caused to be made or used, false records and statements, and omitting material facts, to get false claims paid or approved.

282.    21st Century conspired to withhold information regarding illegal inducements and kickbacks used to obtain and continue the contract wherein thousands of cancer patients were referred to 21st Century within Broward Health's vast system, including Medicare, Medicaid, and TRICARE patients and federal employees or retired federal employees.

283.    As a result, the United States was unaware of the false claims submitted and caused by 21st Century and the United States paid and continues to pay claims that would not be paid if the Defendant's unlawful conduct was known to the United States.

284.    By reason of Defendant's acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

285.   By virtue of Defendant's conspiracy to defraud the United States, the United States sustained damages and is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

### D. *Causing False Certifications, 31 U.S.C. § 3729(a)(1)(B)*

286.   Relator repeats and realleges the allegations and statements contained in all of the preceding paragraphs as though fully set forth herein.

287.   In pertinent part, the False Claims Act establishes liability for "any person who…knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B).

288.   Compliance with Anti-Kickback Statute was an explicit condition of payment under Federal Healthcare Programs for radiation oncology services by 21st Century at Broward Health.

289.   21st Century caused false express and implied certifications of compliance with Federal Anti-Kickback Statute.

290.   In reliance on such express and implied certifications, the United States made payments to 21st Century and Broward Health under Federal Healthcare Programs. If the United States had known that the certifications of compliance were false, Federal payments under the Federal Healthcare Programs would not have been made to 21st Century and Broward Health for radiation oncology services in each of the years in question.

291.   By virtue of the false records, false statements, and false certifications made or caused by 21st Century, the United States sustained damages and therefore is entitled to treble damages against 21st Century under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

### E.  *Knowingly Retaining Overpayments, 31 U.S.C. § 3729(a)(1)(G)*

292.    Relator repeats and realleges the allegations and statements contained in all of the preceding paragraphs as though fully set forth herein.

293.    The False Claims Act also establishes liability for any person who "knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). The False Claims Act defines "obligation" as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3).

294.    "An entity that collects payment for [Designated Health Services] that was performed pursuant to a prohibited referral must refund all collected amounts on a timely basis." 42 C.F.R. § 411.353(d).

295.    "The OIG may impose a penalty, and where authorized, an assessment against any person...whom it determines...[h]as not refunded on a timely basis....amounts collected as the result of billing an individual, third party payer or other entity for a [DHS] that was provided in accordance with a prohibited referral as described in [42 C.F.R. § 411.353]." 42 C.F.R. § 1003.102(b)(9).

296.    21st Century has knowingly caused and retained overpayments from Federal Healthcare Programs arising from its violations of the Anti-Kickback Statute addressed above.

297.    By virtue of 21st Century causing and retaining overpayments from the Medicare Program, the Medicaid Program, and other Federal Healthcare Programs, the United States sustained damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

### F. *False Record to Avoid Refund, 31 U.S.C. § 3729 (a)(1)(G)*

298.    Relator repeats and realleges the allegations and statements contained in all of the preceding paragraphs as though fully set forth herein.

299.    The False Claims Act also establishes liability for any person who "knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G).

300.    21st Century knowingly made and used, or caused to be made or used, false records or false statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States.

301.    By virtue of the false records or false statements made by 21st Century, the United States sustained damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

302.    Additionally, the United States is entitled to a civil penalty of between $5,500 and $11,000 for each false claim made or caused to be made by Defendants arising from their unlawful conduct as described herein.

### VI.    **Prayers for Relief**

303.    On behalf of the United States, Relator David Di Pietro requests and prays that judgment be entered against 21st Century in the amount of the United States' damages, trebled as required by law, such civil penalties as are required by law, for a *qui tam* relator's share as specified by 31 U.S.C. §3730(d), for attorney's fees, costs and expenses as provided by 31 U.S.C. §3730(d), and for all such further legal and equitable relief as may be just and proper.

**JURY TRIAL IS HEREBY DEMANDED.**

Respectfully submitted, this the ___ day of April, 2016.

Jonathan Kroner
Florida Bar No. 328677
Jonathan Kroner Law Office
420 Lincoln Rd., Suite 248
Miami Beach, FL 33139
305.310.6046
JK@FloridaFalseClaim.com


**Lead counsel:**

Bryan A. Vroon, Esq. (*Pro Hac Vice* Admission
Motion to be Filed)
Georgia Bar No. 729086
Law Offices of Bryan A. Vroon, LLC
1766 West Paces Ferry Road
Atlanta Georgia 30327
(404) 441-9806
bryanvroon@gmail.com

Counsel for Relator David Di Pietro

## **CERTIFICATE OF SERVICE**

This is to certify that I have this day served a copy of the within and foregoing Relator's Complaint Under Federal False Claims Act by depositing a true and correct copy of same by United States Postage signature receipt requested, addressed as follows:

> The Honorable Attorney General Loretta E. Lynch
> Attorney General of the United States
> Attention: Seal Clerk
> United States Department of Justice
> 950 Pennsylvania Avenue NW
> Washington, D.C.  20530-0001
>      and
> The Honorable United States Attorney Wifredo A. Ferrer
> **Via hand delivery** to Asst. United States Attorney Mark Lavine
> 99 N.E. 4th Street
> Miami, FL 33132

This ____ day of April, 2016.

Jonathan Kroner